# Exhibit A

AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
for the

Southern District of Ohio

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | )<br>)<br>) | Case No. 1:21-mj-341 |
| The Red-Colored Apple iPhone with a Green Protective Case and No Visible Serial Number Currently in ATF Property as ATF Property Item #25 | )<br>)<br>) | |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

    I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

  See Attachment A (incorporated by reference).

located in the _____Southern_____ District of _____Ohio_____ , there is now concealed *(identify the person or describe the property to be seized)*:

  See Attachment B (incorporated by reference).

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

  ☑ evidence of a crime;

  ❒ contraband, fruits of crime, or other items illegally possessed;

  ❒ property designed for use, intended for use, or used in committing a crime;

  ❒ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1951(a) | Hobbs Act Robbery |
| 18 U.S.C. § 922(g)(1) | Felon in Possession of a Firearm |

  The application is based on these facts:

  See Attached Affidavit (incorporated by reference).

  ☑ Continued on the attached sheet.

  ❒ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

DEREK GRAHAM
Digitally signed by DEREK GRAHAM
Date: 2021.04.19 14:33:11 -04'00'

*Applicant's signature*

Derek Graham, ATF Special Agent

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____FaceTime Video Conference_____ *(specify reliable electronic means).*

Date: **Apr 19, 2021**

Karen L. Litkovitz
**United States Magistrate Judge**

City and state:   Cincinnati, Ohio

## <u>ATTACHMENT A</u>

### Property To Be Searched

The property to be searched is described as the red-colored Apple iPhone in a green protective case with no visible serial number currently located in ATF Property at 550 Main St. Suite 8-491 Cincinnati, OH 45202, as ATF Property Item #025 (the "**Subject Device**"):



## ATTACHMENT B

1.      All records on the Subject Device described in Attachment A that relate to violations of 18 U.S.C. §§ 1951(a) (Hobbs Act Robbery) and 922(g)(1) (Felon in Possession of a Firearm or Ammunition) (the Target Offenses) involving WILLIE ATTAWAY and LAMOND JOHNSON after on or about February 8, 2021, specifically:

   a.   All records and information relating to firearms and ammunition, including information about sources of firearms and ammunition (including names, phone numbers, addresses, and other identifying information);

   b.   All records and information relating to the location of the Subject Device, of WILLIE ATTAWAY or LAMOND JOHNSON, and of any coconspirators relating to the Target Offenses;

   c.   All records and information relating to the robberies and attempted robberies of gas stations and convenience stores in Mason, Hamilton, Madeira, Blue Ash, and Lebanon, Ohio, on or about February 8 and 9, 2021;

   d.   All records and information relating to the shooting of R.G. at Madeira Beverage on or about February 9, 2021;

   e.   All records and information relating to preparatory steps taken in furtherance of the scheme to rob convenience stores and gas stations in the Southern District of Ohio on or about February 8 and 9, 2021;

      f.   All records and information relating to vehicles used in furtherance of the Target
Offenses;

      g.   All records and information relating to U.S. currency;

      h.   All records and information relating the possession and/or disposition of stolen
property relating to the Target Offenses;

      i.   All records and information relating to the identity and whereabouts of any
coconspirators involved in the commission of the Target Offenses;

      j.   Evidence of user attribution showing who used or owned the Subject Device at
the time the things described in this warrant were created, edited, or deleted, such
as logs, phonebooks, saved usernames and passwords, documents, and browsing
history;

As used above, the terms "records" and "information" include all of the foregoing items
of evidence in whatever form and by whatever means they may have been created or stored,
including any form of computer or electronic storage (such as flash memory or other media that
can store data) and any photographic form.

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF THE RED-COLORED APPLE IPHONE WITH A GREEN PROTECTIVE CASE AND NO VISIBLE SERIAL NUMBER, CURRENTLY IN ATF PROPERTY AS ATF PROPERTY ITEM #025 | **FILED UNDER SEAL**<br><br><br>Case No. __1:21-mj-341__ |

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Derek S. Graham, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.    I make this affidavit in support of an application  under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of an electronic device (the **SUBJECT DEVICE**) that is currently in law enforcement possession and the extraction from the electronic device of electronically stored information described in Attachment B.

2.    I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms & Explosives (ATF), and have been so employed since October of 2007.  As a part of my training with the ATF, I graduated from the Federal Law Enforcement Training Center, Criminal Investigator School, located in Brunswick, Georgia.  I graduated from the ATF Special Agent Basic Training Academy, located in Brunswick, Georgia, in April 2008.  Prior to my employment with ATF, I was a Federal Air Marshal in the Department of Homeland Security from June 2006 through October 2007.  In addition, I was a Criminal Research Specialist with the Washington, DC High Intensity Drug Trafficking Area/Drug Enforcement Administration from June 2003 through June 2006.  I am a graduate of Augustana College, where I received a

Bachelor's degree in Business Administration in May of 2002. I am also a graduate of Boston University, where I received a master's degree in Criminal Justice in June of 2006.

3. I have experience in the investigation, apprehension, and prosecution of individuals suspected of being involved in federal firearms and drug offenses. I have specific experience in investigating the use of cell phones by criminal suspects who are involved in the commission of those offenses. I also have knowledge of the technology used by law enforcement authorities to identify cell phones' users and geographic locations. I have applied for, obtained, and analyzed, or assisted other federal Special Agents and local police officers with applying for, obtaining, and analyzing, more than 360 sets of historical call detail records. In addition, I have mapped in excess of 200 sets of historical records related to telephone cell site information, ping order locations, and/or GPS records. I have been trained by ATF as a Digital Media Collection Specialist (DMCS), and have completed more than 285 forensic extractions of cellular telephones, computers, and other electronic storage media. I have also reviewed forensic extractions of cellular telephones, computers, and other electronic storage media, and have examined content and communications contained within these devices obtained by forensic extraction. This content includes records of communication through call logs, text message content, images and videos, and communication made through various social media applications.

4. I know from training and experience that individuals typically keep cell phones on their persons or within their immediate control, such as in the cupholder of a car they are driving, because cell phones are regularly used and possessed as an item of personal property. I also know from my training and experience that in today's age it is typical for individuals engaged in criminal activity to possess multiple active cellular phones at one time. For example, many criminals have one phone that they use for personal communications (e.g., with family members)

and another phone that they use to communicate with criminal associates. Similarly, I know that drug dealers commonly have one phone they use with their customers and another they use with their suppliers so that, if one phone is wiretapped, law enforcement will not be able to identify the entire supply chain. I also know from experience that it is common for individuals to keep and store their old cell phones, because they may not want to lose information and photos saved to that device; such "old" phones may also contain information relevant information to ongoing criminal investigations.

5.      Based on my training and experience and the facts set forth in this affidavit, there is probable cause to believe that WILLIE ATTAWAY and LAMOND JOHNSON have violated 18 U.S.C. §§ 922(g) and 1951(a). There is also probable cause to search the **SUBJECT DEVICE** described in Attachment A for evidence of these crimes further described in Attachment B.

6.      This affidavit is intended to show merely that there is probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## PROBABLE CAUSE

### A.      Introduction

7.      Over the course of two days, from February 8 to 9, 2021, five gas stations or convenience stores in Hamilton, Mason, Madeira, Blue Ash, and Lebanon, Ohio (all within the Southern District of Ohio) were robbed. In one of the robberies, a suspect shot the owner of the gas station, who later died from his injuries.

8.      As I explain in more detail below, the evidence to date suggests that WILLIE ATTAWAY and LAMOND JOHNSON are responsible for all five robberies.

9. I am seeking this warrant for an iPhone that I believe was used by WILLIE ATTAWAY (the **SUBJECT DEVICE**), because there is probable cause to believe that a search of this device will yield evidence of the crimes under investigation.

**B.** **On February 8, 2021, at around 7:48 pm, a Shell gas station in Mason was robbed by a suspect carrying a firearm.**

10. On February 8, 2021, at approximately 7:48 pm, the Warren County Sheriff's Office received a report of a robbery at the Shell Gas Station at 9791 Mason Montgomery Road in Mason, OH. Shell Gas Station is engaged in the sale of alcohol and/or other items that, based on my training and experience, I know have affected interstate commerce.

11. Surveillance video from that evening, which includes audio, shows that two Shell Gas Station employees, Victim 1 and Victim 2, were working behind the counter in the area of the cash registers when a suspect who appears to be a Black male entered the gas station. The suspect was wearing a black hooded sweatshirt that read "Nike" in white lettering, with a white Nike "swoosh" logo. The sweatshirt's hood was over his head. The suspect was also wearing black pants with a white logo on the left pant leg, black gloves, black shoes with a small bit of white on the top, and a red face mask or bandana with white accents, as shown in the screenshot below.

4



12.     After entering, the suspect walked around the counter to the employee area, where Victim 1 and Victim 2 were standing.  The suspect then demanded that Victim 1 and Victim 2 open the cash register and place the currency from the cash registers in a bag.  Victim 1 and Victim 2 each opened their respective cash registers and placed the currency from their cash registers into separate plastic bags.  The suspect then took the bags and left.  As the suspect left, Victim 1 and Victim 2 raised their hands in a gesture that, based on my training and experience, I believe they intended to mean "Do not shoot."

13.     Surveillance video shows that, after leaving the gas station, the suspect ran west.

14.     Surveillance video from a nearby BP gas station, which is located south of the Shell station, shows that, at approximately the same time as the robbery, a person ran from the Shell station over to Monro Auto Service, which is west of the Shell station, and got into a large, white SUV as a passenger. The SUV drove away. Based on this video, I believe that the suspect had a coconspirator who was driving the getaway vehicle.

15.     In an interview, Victim 1 and Victim 2 both said that they had seen a firearm.

5

16.     The screenshot below shows a map of 9791 Mason Montgomery Road, Monro Auto Service, the BP station, and surrounding areas:



**C.     Less than an hour later, a Shell gas station in Hamilton was robbed by an armed suspect matching the same description.**

17.     Less than an hour later, at approximately 8:34 pm on February 8, the Hamilton Police Department received a report of a robbery at the Shell Gas Station at 2693 Dixie Highway in Hamilton, OH.  This Shell gas station is approximately 17 miles from the Shell station described in the preceding section; a search for directions on Google Maps shows that driving from one to the other would take approximately 28 to 35 minutes, depending on the route.

18.     Shell Gas Station is engaged in the sale of alcohol and/or other items that, based on my training and experience, I know have affected interstate commerce.

19.     Surveillance video from that evening shows a suspect matching the description of the suspect in the earlier robbery entering the gas station. Specifically, the surveillance video shows an individual who appears to be a Black male and who appears to be wearing the same

6

outfit as the suspect from the Mason incident: a black hooded sweatshirt reading "Nike" and with the "swoosh" logo (and with the hood up), black gloves, black shoes with a tiny bit of white on top, and a red face mask or bandana with white accents pulled across his face. The suspect appears to be holding a firearm in his right hand, as shown below:



20.    Surveillance video shows that the suspect walked behind the counter, while holding the suspected firearm in his right hand, to where a Shell Gas Station employee (Victim 3) was standing. The suspect then directed Victim 3 to put the currency from the cash register into a bag. Victim 3 complied, and the suspect then took the bag and left.

21.    The screenshot below shows a map of the relevant Shell gas station in Hamilton and surrounding areas:



**D.     The next day, at approximately 7:39 pm, Victim 4 was shot and killed during an attempted robbery at Madeira Beverage.**

22.     The next day, on February 9, 2021, at approximately 7:39 pm, Madeira Police Department received a report of an attempted robbery in which a person had been shot.  The attempted robbery occurred at Madeira Beverage, a convenience store, located at 6005 Kenwood Road, Madeira, OH.  Madeira Beverage is engaged in the sale of alcohol and/or other items that, based on my training and experience, I know have affected interstate commerce.

23.     The shooting victim (Victim 4) was the owner of Madeira Beverage and had been working in Madeira Beverage that evening.  Victim 4 succumbed to his gunshot-related injuries later that same night.

24.     That same night, MPD Officers and participating officers located an expended .25 caliber cartridge casing suspected to be ejected from the firearm during the shooting of Victim 4.

25.     Surveillance video from that evening shows that a suspect, who appears to be a Black male, entered the store wearing a black hooded sweatshirt.  The sweatshirt had an

8

unidentifiable white logo or text in the upper left chest area. The suspect was also wearing a red face mask or bandana on his face.



26.     The suspect entered the store and appeared to look down multiple aisles as he walked through the store. The suspect then confronted Victim 4, at which time Victim 4 and the suspect appeared to push and wrestle with each other for approximately four seconds. Victim 4 then raised his hands as the suspect displayed and pointed a firearm at Victim 4, as shown in the image below:



9

27.    Surveillance footage shows that Victim 4 then appeared to wave the suspect away.  Victim 4 then stepped backwards and turned while holding his abdomen.  The suspect then exited Madeira Beverage.

28.    External surveillance cameras show the suspect running from the building in a southern direction.

29.    The screenshot below is a map of 6005 Kenwood Road, where Madeira Beverage is located, and surrounding areas.



**E.    Less than 15 minutes later, a Sunoco gas station in Blue Ash was robbed at gunpoint.**

30.    Less than 15 minutes later, at approximately 7:50 pm on February 9, Blue Ash Police Department received a report of a robbery at the Sunoco Gas Station at 10410 Kenwood Road in Blue Ash, OH.  This Sonoco is approximately five miles from Madeira Beverage, both of which are on Kenwood Road.

31.    Sunoco Gas Station is engaged in the sale of alcohol and/or other items that, based on my training and experience, I know have affected interstate commerce.

10



32.    Surveillance video of this incident is not currently available for review.

33.    I have reviewed a statement written out by a law enforcement officer who interviewed an employee working at the Sonoco gas station that night (Victim 5).  The statement indicates that the police officer "wrote out [the] statement" for Victim 5 "due to language barrier."  Victim 5 said that the suspect was a Black man wearing a red jacket and a black face mask. Victim 5 said that he/she "saw a small black gun."  Victim 5 said that the suspect aimed the firearm at Victim 5 and said "open the register & take a plastic bag & put in the money."  Victim 5 said that he/she and the suspect then put money in the bag and that the suspect then took the bag and ran out towards Kenwood, around the building.

34.    Although Victim 5's description of the suspect differs from the description of the suspect observed in surveillance video described above, I believe that the same suspect, and/or his coconspirator, was likely involved in this robbery due to the geographic and temporal proximity to the other robberies described in this affidavit.

11

35.     As I described above, surveillance video relating to the incident at the Shell station in Mason suggests that, after the robbery, the suspect got into a white SUV as the passenger. Similarly, as I describe below, a witness to the fifth robbery, in Lebanon, saw the suspect run from the store and get into a vehicle as a passenger.  Based on these facts, I believe that the robber was not acting alone.

**F.      About 90 minutes later, a suspect in a black hoodie and a red mask attempted to rob a Marathon gas station in Lebanon at gunpoint.**

36.     Later the same night, at approximately 9:19 pm, Lebanon Police Department (LPD) received a report of an attempted robbery at the Marathon Gas Station located at 660 North Broadway Street, Lebanon, OH.  This Marathon is approximately 18 miles away from the Sonoco described in the preceding section; a search on Google Maps suggests that a direct trip between the two would take approximately 25 minutes.

37.     Marathon Gas Station is engaged in the sale of alcohol and/or other items that, based on my training and experience, I know have affected interstate commerce.

38.     Based on reports I have reviewed, I understand that the surveillance cameras in the Marathon gas station were not operational at the time of the incident.

39.     An employee of the Marathon Gas Station, Victim 6, said that a Black male entered the store wearing a black sweatshirt and with a red mask on his face with white accents on the fabric.

40.     Victim 6 said the suspect entered the store, removed a soda pop from the cooler, and approached the counter.  Victim 6 stated he/she told the suspect how much the soda pop cost, at which the time suspect pointed a firearm at Victim 6 and staid, "Give me what you got." Victim 6 said he/she did not comply with the suspect's demand and instead leaned down and

12

grabbed under the counter, pretending he/she had a firearm. Victim 6 said the subject then ran from the Marathon Gas Station.

41.  Victim 6 said he/she followed the suspect out of the store and saw a small, dark-colored SUV perform a U-turn on North Broadway and then pick up the suspect. Victim 6 described the driver as a Black male wearing a mask of an unknown color.

42.  Victim 6 said he/she attempted to follow the vehicle as it drove south on North Broadway.

43.  At approximately the same time as the robbery, traffic cameras in the city of Lebanon captured a suspected dark-colored Chevrolet Equinox driving with its headlights off as it continued south on North Broadway and turned left onto Main Street, driving east.

44.  The screenshot below is a map of the location of the Marathon gas station and surrounding areas:



**G.** **Based on the investigation to date, I believe that the same two suspects likely committed all five of the robberies described above.**

45.     Because of the geographic and temporal proximity of all five of the robberies; because surveillance video shows a similar suspect in a black hooded sweatshirt and with a red face covering in the first, second, third, and fifth robbery; and because surveillance video or Victim statements from some of the robberies suggest that the suspect entered a getaway vehicle as a passenger, I believe that the same suspect and a coconspirator are involved in all of the robberies described above.

**H.** **Information from Google suggests that an electronic device associated with LAMOND JOHNSON, a convicted felon, was present at at least four of the robberies.**

46.     Based on my training and experience, as well as open-source materials published by Google LLC ("Google"), I know that Google offers accountholders a service called "Location History," which authorizes Google, when certain prerequisites are satisfied, to collect and retain a record of the locations where Google calculated a device to be based on information transmitted to Google by the device. That Location History is stored on Google servers, and it is associated with the Google account that is associated with the device. Each accountholder may view their Location History and may delete all or part of it at any time.

47.     Based on my training and experience, I know that the location information collected by Google and stored within an account's Location History is derived from sources including GPS data and information about the wi-fi access points and Bluetooth beacons within range of the device.  Google uses this information to calculate the device's estimated latitude and longitude, which varies in its accuracy depending on the source of the data.  Google records the

margin of error for its calculation as to the location of a device as a meter radius, referred to by Google as a "maps display radius," for each latitude and longitude point.

48.     On February 12, 2021, the Honorable Judge Litkovitz, U.S. Magistrate Judge for the Southern District of Ohio, issued Search Warrant No. 1:21-MJ-0158, directing Google to provide information and records relating to any Google accounts that were present in at particular locations and particular times associated with the robberies described above, specifically:

### Incident 1: Shell Gas Station - 9791 Mason-Montgomery Road, Mason, OH

- Date: February 8, 2021
- Time Period: 7:40pm – 7:55pm EST (Eastern Standard Time), UTC -5 Hours
- Target Location:  Area contained within below listed points
  - Point A: 39.296221, -84.317776
  - Point B: 39.296090, -84.315510
  - Point C: 39.295320, -84.315633
  - Point D: 39.295428, -84.317975



### Incident 2: Shell Gas Station - 2693 Dixie Highway, Hamilton, OH

- Date: February 8, 2021
- Time Period:  8:25pm – 8:40pm EST (Eastern Standard Time) UTC -5 Hours
- Target Location:   Geographical area contained within the below listed points

- o      Point A: 39.369753, -84.548786
- o      Point B: 39.369605, -84.547314
- o      Point C: 39.368719, -84.546825
- o      Point D: 39.368824, -84.548856



### Incident 3: Madeira Beverage - 6005 Kenwood Road, Madeira, OH

- Date: February 9, 2021
- Time Period: 7:30pm – 7:45pm EST (Eastern Standard Time) UTC -5 Hours
- Target Location: Geographical area contained within the below listed points
  - o      Point A: 39.175858, -84.384784
  - o      Point B: 39.176247, -84.383480
  - o      Point C: 39.175407, -84.383912
  - o      Point D: 39.175346, -84.385028



Incident 4: Sunoco Gas Station – 10410 Kenwood Road, Blue Ash, OH

- Date: February 9, 2021
- Time Period:  7:45pm – 8:00pm EST (Eastern Standard Time) UTC -5 Hours
- Target Location:   Geographical area contained within the below listed points
  - Point A: 39.252955, -84.375301
  - Point B: 39.252697, -84.373943
  - Point C: 39.250004, -84.374299
  - Point D: 39.250736, -84.375569



Incident 5: Marathon Gas Station – 660 North Broadway Street, Lebanon, OH

- Date: February 9, 2021
- Time Period:  9:10pm – 9:25pm EST (Eastern Standard Time) UTC -5 Hours
- Target Location:   Geographical area contained within the below listed points
  - Point A: 39.446145, -84.206722
  - Point B: 39.446348, -84.203562
  - Point C: 39.443448, -84.204002
  - Point D: 39.439320, -84.207115
  - Point E: 39.433806, -84.207528

17

       o   Point F: 39.433347, -84.203492

       o   Point G: 39.432357, -84.203525

       o   Point H: 39.432789, -84.209243



49.     On March 1, 2021, Google provided Anonymized Device Identification (ID) information for Google accounts present at the described locations and time ranges. I conducted an analysis of the Anonymized Device ID information and identified three Anonymized Device IDs—ID numbers -967784745, 469003548, 290681031—that, according to Google's data, were present at all of the following locations during the time periods listed above:

- February 8, 2021 – Shell Gas 9791 Mason-Montgomery Rd., Mason, OH

- February 8, 2021 – Shell Gas 2693 Dixie Hwy, Hamilton, OH

- February 9, 2021 – Sunoco Gas 10410 Kenwood Rd., Blue Ash, OH

- February 9, 2021 – Marathon Gas 660 N. Broadway St., Lebanon, OH

18

50.     I requested that Google provide identifying information for those three IDs, and

on March 5, 2021, Google provided information showing that the Anonymized Device IDs are

associated with the following Google Account IDs:

- Anonymized Device ID -967784745  = Google Account ID 369781974448

- Anonymized Device ID 469003548 = Google Account ID 583241281066

- Anonymized Device ID 290681031 = Google Account ID 849998195587

51.     The records from Google showed that Google Account ID 369781974448 is

associated with the following subscriber:

    a.   Name: LAMOND JOHNSON

    b.   Email: johnsonlamond33@gmail.com

    c.   Recovery Email: johnsonlamond3@gmail.com

    d.   Recovery SMS: 513-280-1364

52.     Google Account ID 583241281066 is associated with the following subscriber:

    a.   Name: Salvatore Ferragamo

    b.   Email: johnsonlamond3@gmail.com

    c.   Recovery Email: johnsonlamond33@gmail.com

    d.   Recovery SMS: 513-280-1364

53.     Google Account ID 849998195587 is associated with the following subscriber:

    a.   Name: LAMOND JOHNSON

    b.   Email: johnsonlamond86@gmail.com

    c.   Recovery Email: None Listed

54.     Because all three of these accounts are associated with the name "Lamond

Johnson" either in the subscriber name or in the email address (all three of which are variations

on "johnsonlamond"), I believe that all three of these accounts are used by the same person. Moreover, because 513-280-1364 is the "Recovery SMS" phone number for two of the three accounts, I believe the user of these accounts likely uses the phone number 513-280-1364. Based on my training and experience, I know that a "Recovery SMS" phone number is the phone number to which Google sends a text message if the user forgets the password to his or her account.

55.     On March 5, 2021, I queried telephone number 513-280-1364 through a database accessible by law enforcement that I have determined in the past to be accurate and credible. Based on this query, I identified telephone number 513-280-1364 to be associated with LAMOND JOHNSON (which is consistent with the subscriber names and email addresses described above).

56.     In 2006, LAMOND JOHNSON was convicted of Kidnapping, Rape, and Aggravated Robbery in Lucas County, Ohio. He was sentenced to 14 years' imprisonment for those offenses and is currently on parole.

**I.      On March 7, 2021, JOHNSON was pulled over in a blue Chevrolet Equinox, which contained a firearm matching the caliber of the murder weapon**.

57.     On March 7, 2021, by following pings from phone number 513-280-1364, agents found JOHNSON and began surveilling him. Later the same day, agents and officers attempted to stop JOHNSON as he was driving a blue Chevrolet Equinox.[1]

---

[1] Recall that Victim 6 said he/she saw a small, dark-colored SUV pick up the suspect after the attempted robbery in Lebanon. I have reviewed surveillance footage from the city of Lebanon from around the time of the robbery, and the video shows a dark-colored SUV, which I believe is a Chevrolet Equinox, driving south on North Broadway with its headlights off.

58. JOHNSON and one passenger from the vehicle both attempted to flee. Another passenger stayed in the vehicle.

59. After the other passenger was removed from the Chevrolet Equinox, agents saw a cell phone in the vehicle's center console.

60. A search of the Equinox yielded a firearm matching the caliber of the ammunition recovered at Madeira Beverage (.25 caliber).

**K.      Willie ATTAWAY, a convicted felon, was identified as the individual who fled from the Chevy Equinox.**

61. Investigators recovered a latent fingerprint from the inside of the front passenger door of the Equinox. The fingerprint was run through a law enforcement database and yielded a match to Willie ATTAWAY.

62. ATTAWAY is a convicted felon on active parole through the state of Ohio. Specifically, ATTAWAY was convicted in the Hamilton County Court of Common Pleas in case number B1200756 of Robbery (F2) and sentenced to a term of incarceration exceeding one year.

63. ATTAWAY turned himself in to law enforcement on March 12, 2021. In a custodial interview, ATTAWAY admitted to being in the Equinox on March 7, 2021, and to running from the vehicle following the crash.

64. When ATTAWAY turned himself in, he did not have a cell phone on him.

**L.      Information from AT&T suggests that a phone associated with ATTAWAY was present at all five of the robberies.**

65. During this investigation, agents obtained a federal search warrant directing AT&T Mobility to provide information and records relating to telephone number 513-596-2421.

66. AT&T's records showed that, as of February 8 and 9, 2021, phone number 513-596-2421 was registered in the name of WILLIE ATTAWAY.

21

67. Call detail records showed that 513-596-2421 was in contact with 513-280-1364 (the phone number associated with LAMOND JOHNSON) more than 70 times between February 5 and February 12, 2021.

68. Cell-site data for 513-596-2421 showed that a device with that phone number interacted with cell sites in the approximate locations of, and at the approximate times of, all five of the robberies described above. Specifically:

   a. **Robbery Location 1 – 9791 Mason Montgomery Road, Mason, OH (reported at approximately 7:48 p.m. on Feb. 8):** Telephone number 513-596-2421 interacted with cell sites approximately .2 and .8 miles away from 9791 Mason Montgomery Road, Mason, OH from 7:12 pm – 7:16 pm. These cell site interactions include voice records and initiated data transactions.

   b. **Robbery Location 2 – 2693 Dixie Highway, Hamilton, OH (reported at approximately 8:34 p.m. on Feb. 8):** Telephone number 513-596-2421 interacted with cell sites approximately 2.5 and 2.7 miles away from 2693 Dixie Highway, Hamilton, OH from 8:34 pm – 9:48 pm. From 8:51 pm – 9:48 pm that same night, the phone number also interacted with cell sites in the immediate area where, later that night, officers recovered a wrecked white GMC Yukon, which had been rented in the name of LAMOND JOHNSON.[2] These cell site interactions include voice records, SMS records, and initiated data transactions.

_____

[2] As noted above, surveillance video suggests that the conspirators used a white SUV on February 8, 2021, and a dark-colored SUV on February 9, 2021.

22

    c.  **Robbery Location 3 – 6005 Kenwood Road, Madeira, OH (reported at approximately 7:39 p.m. on Feb. 9):** Telephone number 513-596-2421 interacted with a cell site approximately 1.4 miles away from 6005 Kenwood Road, Madeira, OH from 7:27 pm – 7:31 pm. These cell site interactions included SMS records.

    d.  **Robbery Location 4 – 10410 Kenwood Road, Blue Ash, OH (reported at approximately 7:50 p.m. on Feb. 9):** Telephone number 513-596-2421 interacted with a cell site approximately .1 miles away from 10410 Kenwood Road, Blue Ash, OH from 7:49 pm – 7:50 pm. These cell site interactions included voice records and initiated data transactions.

    e.  **Robbery Location 5 – 660 North Broadway Street, Lebanon, OH (reported at approximately 9:19 p.m. on Feb. 9):** Telephone number 513-596-2421 interacted with cell sites approximately 2.2 miles and 3.0 miles from 660 North Broadway Street, Lebanon, OH from 9:04pm – 9:26pm. These cell site interactions included voice records and initiated data transactions.

**M.** ██████████████████████████████████████████

69.    On April 14, 2021, ████████████████████████████



70.    Later the same day, █████████████████████████████

██████████████████████████████ The **SUBJECT DEVICE** is

further described as a red-colored Apple iPhone, in a green protective case with no visible serial

number. I placed the **SUBJECT DEVICE** into ATF Property as ATF Property Item #025.



71. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

72. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

73. Based on the fact that a phone subscribed in ATTAWAY's name interacted with

cell sites at the approximate locations and times of the five robberies described above, ▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮, I believe that the **SUBJECT DEVICE**

likely contains evidence of the crimes under investigation.

74. The **SUBJECT DEVICE** is currently in the lawful possession of the ATF under

the circumstances described above. Therefore, while the ATF might already have all necessary

authority to examine the **SUBJECT DEVICE**, I seek this warrant out of an abundance of

caution to be certain that an examination of the **SUBJECT DEVICE** will comply with the

Fourth Amendment and other applicable laws.

75. The **SUBJECT DEVICE** is currently in storage at the ATF's Cincinnati Field

Office at 550 Main St. Suite 8-491, Cincinnati, OH 45202. In my training and experience, I

know that the **SUBJECT DEVICE** has been stored in a manner in which its contents are, to the

extent material to this investigation, in substantially the same state as they were when it first

came into the possession of the ATF.

## **TECHNICAL TERMS**

76.     Based on my training and experience, I use the following technical terms to
convey the following meanings:

a.   Wireless telephone:  A wireless telephone (or mobile telephone, or cellular
     telephone) is a handheld wireless device used for voice and data communication
     through radio signals.  These telephones send signals through networks of
     transmitter/receivers, enabling communication with other wireless telephones or
     traditional "land line" telephones.  A wireless telephone usually contains a "call
     log," which records the telephone number, date, and time of calls made to and
     from the phone.  In addition to enabling voice communications, wireless
     telephones offer a broad range of capabilities.  These capabilities include: storing
     names and phone numbers in electronic "address books;" sending, receiving, and
     storing text messages and e-mail; taking, sending, receiving, and storing still
     photographs and moving video; storing and playing back audio files; storing
     dates, appointments, and other information on personal calendars; and accessing
     and downloading information from the Internet.  Wireless telephones may also
     include global positioning system ("GPS") technology for determining the
     location of the device.

b.   Digital camera:  A digital camera is a camera that records pictures as digital
     picture files, rather than by using photographic film.  Digital cameras use a
     variety of fixed and removable storage media to store their recorded images.
     Images can usually be retrieved by connecting the camera to a computer or by
     connecting the removable storage medium to a separate reader.  Removable

storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When

26

a GPS antenna receives signals from at least four satellites, a computer connected
to that antenna can mathematically calculate the antenna's latitude, longitude, and
sometimes altitude with a high level of precision.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used
for storing data (such as names, addresses, appointments or notes) and utilizing
computer programs. Some PDAs also function as wireless communication
devices and are used to access the Internet and send and receive e-mail. PDAs
usually include a memory card or other removable storage media for storing data
and a keyboard and/or touch screen for entering data. Removable storage media
include various types of flash memory cards or miniature hard drives. This
removable storage media can store any digital data. Most PDAs run computer
software, giving them many of the same capabilities as personal computers. For
example, PDA users can work with word-processing documents, spreadsheets,
and presentations. PDAs may also include global positioning system ("GPS")
technology for determining the location of the device.

77. Based on my training, experience, and research, I know that the Device has
capabilities that allow it to serve as a wireless telephone, digital camera, portable media player,
GPS navigation device, and PDA. In my training and experience, examining data stored on
devices of this type can uncover, among other things, evidence that reveals or suggests who
possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

78. Based on my knowledge, training, and experience, I know that electronic devices
can store information for long periods of time. Similarly, things that have been viewed via the

Internet are typically stored for some period of time on the device. This information can

sometimes be recovered with forensics tools.

79.     There is probable cause to believe that things that were once stored on the Subject

Device may still be stored there, for at least the following reasons:

    a.  Based on my knowledge, training, and experience, I know that computer files or

        remnants of such files can be recovered months or even years after they have been

        downloaded onto a storage medium, deleted, or viewed via the Internet.

        Electronic files downloaded to a storage medium can be stored for years at little

        or no cost. Even when files have been deleted, they can be recovered months or

        years later using forensic tools. This is so because when a person "deletes" a file

        on a computer, the data contained in the file does not actually disappear; rather,

        that data remains on the storage medium until it is overwritten by new data.

    b.  Therefore, deleted files, or remnants of deleted files, may reside in free space or

        slack space—that is, in space on the storage medium that is not currently being

        used by an active file—for long periods of time before they are overwritten. In

        addition, a computer's operating system may also keep a record of deleted data in

        a "swap" or "recovery" file.

    c.  Wholly apart from user-generated files, computer storage media—in particular,

        computers' internal hard drives—contain electronic evidence of how a computer

        has been used, what it has been used for, and who has used it. To give a few

        examples, this forensic evidence can take the form of operating system

        configurations, artifacts from operating system or application operation, file

        system data structures, and virtual memory "swap" or paging files. Computer

28

users typically do not erase or delete this evidence, because special software is
typically required for that task. However, it is technically possible to delete this
information.

    d.  Similarly, files that have been viewed via the Internet are sometimes
automatically downloaded into a temporary Internet directory or "cache."

80.  *Forensic evidence.* As further described in Attachment B, this application seeks
permission to locate not only electronically stored information that might serve as direct
evidence of the crimes described on the warrant, but also forensic evidence that establishes how
the Subject Device was used, the purpose of its use, who used it, and when. There is probable
cause to believe that this forensic electronic evidence might be on the Subject Device because:

    a.  Data on the storage medium can provide evidence of a file that was once on the
storage medium but has since been deleted or edited, or of a deleted portion of a
file (such as a paragraph that has been deleted from a word processing file).

    b.  Forensic evidence on a device can also indicate who has used or controlled the
device. This "user attribution" evidence is analogous to the search for "indicia of
occupancy" while executing a search warrant at a residence.

    c.  A person with appropriate familiarity with how an electronic device works may,
after examining this forensic evidence in its proper context, be able to draw
conclusions about how electronic devices were used, the purpose of their use, who
used them, and when.

    d.  The process of identifying the exact electronically stored information on a storage
medium that is necessary to draw an accurate conclusion is a dynamic process.
Electronic evidence is not always data that can be merely reviewed by a review

29

team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.  Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

81.     *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the **SUBJECT DEVICE** consistent with the warrant.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

82.     *Manner of execution.*  Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

83.     I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the **SUBJECT DEVICE** described in Attachment A to seek the items described in Attachment B.

## REQUEST FOR SEALING

84.     I further request that the Court order that all papers in support of this application, including the affidavit and warrant, be sealed until further order of the Court.  These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation.  Accordingly, there is good cause to seal these documents because their premature disclosure may give targets an opportunity to flee/continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior, notify confederates, or otherwise seriously jeopardize the investigation.


Respectfully submitted,

DEREK GRAHAM
Digitally signed by
DEREK GRAHAM
Date: 2021.04.19
14:34:14 -04'00'

Derek S. Graham
Special Agent
Bureau of Alcohol, Tobacco, Firearms and Explosives


Subscribed and sworn to before me in accordance with the requirements of Federal Rule of Criminal Procedure 4.1 on April _____19_____, 2021.


Karen L. Litkovitz
United States Magistrate Judge

## ATTACHMENT A

### Property To Be Searched

The property to be searched is described as the red-colored Apple iPhone in a green protective case with no visible serial number currently located in ATF Property at 550 Main St. Suite 8-491 Cincinnati, OH 45202, as ATF Property Item #025 (the "**Subject Device**"):



**ATTACHMENT B**

1.      All records on the Subject Device described in Attachment A that relate to violations of 18 U.S.C. §§ 1951(a) (Hobbs Act Robbery) and 922(g)(1) (Felon in Possession of a Firearm or Ammunition) (the Target Offenses) involving WILLIE ATTAWAY and LAMOND JOHNSON after on or about February 8, 2021, specifically:

a.   All records and information relating to firearms and ammunition, including information about sources of firearms and ammunition (including names, phone numbers, addresses, and other identifying information);

b.   All records and information relating to the location of the Subject Device, of WILLIE ATTAWAY or LAMOND JOHNSON, and of any coconspirators relating to the Target Offenses;

c.   All records and information relating to the robberies and attempted robberies of gas stations and convenience stores in Mason, Hamilton, Madeira, Blue Ash, and Lebanon, Ohio, on or about February 8 and 9, 2021;

d.   All records and information relating to the shooting of R.G. at Madeira Beverage on or about February 9, 2021;

e.   All records and information relating to preparatory steps taken in furtherance of the scheme to rob convenience stores and gas stations in the Southern District of Ohio on or about February 8 and 9, 2021;

  f. All records and information relating to vehicles used in furtherance of the Target Offenses;

  g. All records and information relating to U.S. currency;

  h. All records and information relating the possession and/or disposition of stolen property relating to the Target Offenses;

  i. All records and information relating to the identity and whereabouts of any coconspirators involved in the commission of the Target Offenses;

  j. Evidence of user attribution showing who used or owned the Subject Device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.